RENDERED: MAY 3, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0521-MR

GREYSON FINDLEY                               APPELLANT

|  |  |
|---|---|
| v. | APPEAL FROM WARREN CIRCUIT COURT<br>HONORABLE CHRISTOPHER T. COHRON, JUDGE<br>ACTION NO. 21-CI-01308 |

WESTERN KENTUCKY
UNIVERSITY                                  APPELLEE

AND

NO. 2023-CA-0527-MR

WESTERN KENTUCKY
UNIVERSITY                             CROSS-APPELLANT

|  |  |
|---|---|
| v. | CROSS-APPEAL FROM WARREN CIRCUIT COURT<br>HONORABLE CHRISTOPHER T. COHRON, JUDGE<br>ACTION NO. 21-CI-01308 |

GREYSON FINDLEY                            CROSS-APPELLEE

BEFORE:  THOMPSON, CHIEF JUDGE; EASTON AND MCNEILL, JUDGES.

MCNEILL, JUDGE:  The Kentucky Board of Claims awarded Greyson Findley ("Findley") $250,000 in damages for loss of earning capacity due to an injury he received while interning for Western Kentucky University ("WKU").  The Warren Circuit Court reduced the award by $191,486.65.  Findley appeals this reduction, and WKU cross-appeals, arguing Findley is not entitled to damages because he failed to prove permanent injury.  For the reasons below, we affirm both appeals.

In 2017, Findley was working as a student intern at WKU's Floral Design Training Center when the blade of a stem cutter fell onto his wrist, resulting in a severe laceration.  Findley was flown to Vanderbilt University Medical Center and underwent surgery to repair severed muscles, tendons, nerves, and an artery in his hand and wrist.  Findley filed a claim with the Board of Claims alleging negligence on the part of WKU, an agency of the Commonwealth, and seeking $250,000 in damages for loss of earning capacity.  WKU stipulated to liability and a hearing was held on damages.

At the hearing, Findley and his parents consistently testified to his physical limitations due to the injury.  He has difficulty with ordinary tasks such as shaving, cutting his fingernails, or carrying a cup of coffee due to decreased

strength in his hand.  Other activities that cause him difficulty are using a knife, separating paper plates, or opening a bag of chips.  His injured hand frequently "locks up," requiring the use of a heating pad and manual manipulation to regain function.  This can happen several times a day and the process to regain use of his hand can take up to thirty minutes.

Findley's treating physician, Dr. Donald Lee, opined in a written response to Findley's attorney that Findley had reached maximum medical improvement by July 21, 2018, and has an 11% permanent impairment rating to his right upper extremity and a 7% permanent impairment rating to his whole person. Findley also offered the testimony of an expert vocational witness, Linda Jones, who estimated Findley's loss of earnings due to his injury would be between $278,579 and $653,788.

WKU countered Jones' testimony through their own vocational expert, Dr. Ralph Crystal.  Dr. Crystal opined that Findley suffered no loss of earning capacity from the injury.  WKU also introduced the report and deposition of Dr. David West, who conducted an independent medical evaluation on behalf of Findley.  Dr. West reported that Findley exhibited decreased sensation to the ring and small fingers consistent with an injury to the ulnar nerve, but there was a possibility sensation could improve over time.

Generally, he noted that Findley had a "fairly normal full range of motion" in terms of flexion and extension of the fingers, and a normal range of motion in the flexion and extension of his wrist. When asked whether he believed Findley lacked a permanent impairment, Dr. West responded, "I wouldn't say that that's the case. I just didn't calculate [an impairment rating]." He commented he would expect "some deficit in grip strength, had it been tested by methods of an FCE (functional capacity evaluation[.]" But he "felt that objectively [Findley's] range of motion was normal . . . and wouldn't necessarily constitute his impairment." A functional capacity evaluation was, in fact, performed and showed decreased grip strength in Findley's injured hand.

Following the evidence, the hearing officer recommended the Board deny Findley's claim, concluding Findley had "failed to establish that the injury he sustained to his hand and wrist has permanently diminished his earning power." The hearing officer found Dr. Crystal's testimony as to permanent impairment more credible than Ms. Jones.' It also declined to consider the impairment rating ascribed by Dr. Lee, holding the hand-written note was inadmissible hearsay and could not serve as a basis for its findings pursuant to KRS[1] 13B.090(1).

---

[1] Kentucky Revised Statutes.

The Board rejected the hearing officer's recommendation and awarded Findley $250,000, the statutory maximum,[2] in damages. The Board found Findley had established that his injury permanently diminished his earning power, relying upon Findley's own testimony and that of his parents. It also ruled Dr. Lee's permanent impairment rating, although hearsay, could be properly relied upon by Ms. Jones in forming her expert opinions, citing KRE[3] 703. The Board found Ms. Jones more credible than Dr. Crystal considering Dr. Crystal's "wholesale rejection of a permanent impairment" assigned by a treating physician.

WKU filed a petition for judicial review in Warren Circuit Court, arguing the Board erred in relying upon Dr. Lee's hand-written note to support a finding of permanent injury, and absent this error, Findley's claim fails as a matter of law. Specifically, it argued KRS 13B.090(1) precludes an agency from relying upon inadmissible hearsay to support its findings of fact and Dr. Lee's note is inadmissible hearsay. Since a claim for loss-of-earning capacity damages requires proof of a permanent injury, absent the note, there is no competent medical proof on that issue. WKU also argued the Board erred in failing to reduce the damage award by the "amount of payments received or the right to receive payment" from collateral sources under KRS 49.130(2).

---

[2] KRS 49.040(1).

[3] Kentucky Rules of Evidence.

The circuit court affirmed the Board's findings that Findley had suffered a permanent injury resulting in a loss of earning capacity. As to permanent injury, it ruled KRS 13B.090(1) inapplicable to the proceedings. As to impairment of earning capacity, the court held the Board's findings were supported by substantial evidence. However, it reversed the damage award, finding the award should be reduced by the "amount of payments . . . [Findley had] the right to receive . . . ." KRS 49.130(2).

Although Findley's insurance paid only $17,940.15 in satisfaction of his medical bills,[4] the total amount billed was $191,486.65. The court determined this total represented the amount Findley had the right to receive, and reduced Findley's award to $58,513.35. The court reasoned that without insurance, Findley would have been required to pay the full balance. Thus, the true value of his insurance, the amount he had the right to receive, was $191,486.65. Essentially, the court read KRS 49.130(2) as requiring a damage award to be reduced by the value of the benefits received by the insured, regardless of the amount actually paid by the insurer. Findley appealed and WKU cross-appealed.

Our standard of review on appeals from the Board of Claims is determined, and limited, by statute. KRS 49.160 provides that we "shall review

---

[4] Presumably the balance was written off or adjusted due to an agreement between the insurance company and the provider.

only the matters subject to review by the Circuit Court and also errors of law arising in the Circuit Court and made reviewable by the Rules of Civil Procedure, where not in conflict with KRS 49.040 to 49.180." The circuit court's review is confined to four grounds which are whether: (1) the Board acted without or in excess of its powers; (2) the award was procured by fraud; (3) the award is not in conformity to the provisions of KRS 49.040 to 49.180; and (4) the findings of fact support the award. KRS 49.150. Because of this limited review, "[a] court may not substitute its own judgment for that of the Board when the findings and conclusions are not clearly erroneous." *Department for Human Resources v. Redmon*, 599 S.W.2d 474, 476 (Ky. App. 1980) (citations omitted).

We begin by addressing WKU's cross-appeal because if successful, Findley's appeal is moot. WKU argues Findley failed to prove he is entitled to damages for loss of earning capacity. To recover damages for permanent impairment of earning power a plaintiff must prove permanent injury. *See Reece v. Nationwide Mut. Ins. Co.*, 217 S.W.3d 226, 229-30 (Ky. 2007). WKU contends no competent evidence established that Findley suffered a permanent injury.

Specifically, it argues the only evidence of permanent injury was Dr. Lee's hand-written note which is insufficient in an administrative proceeding under KRS 13B.090(1). KRS 13B.090(1) provides that

> In an administrative hearing, findings of fact shall be based exclusively on the evidence on the record. . . .

-7-

Hearsay evidence may be admissible, if it is the type of evidence that reasonable and prudent persons would rely on in their daily affairs, but it shall not be sufficient in itself to support an agency's findings of facts unless it would be admissible over objections in civil actions.

Because Dr. Lee's note was inadmissible hearsay, the Board could not rely upon it to establish permanent injury. WKU asserts the Board erred in finding the note admissible under KRE 703, and the circuit court erred in affirming the Board.

Avoiding KRE 703 altogether, the circuit court held KRS 13B.090 did not apply to proceedings before the Board of Claims and therefore it was proper for the Board to consider Dr. Lee's assessment in finding permanent injury. WKU challenges the court's determination, citing 802 KAR[5] 2:010 §13, a regulation governing negligence claims before the Board, which provides: "Except as otherwise established in KRS Chapter 49 or this administrative regulation, the conduct of hearings shall be governed by the procedures established in KRS Chapter 13B."

Despite this language, KRS 13B.020 specifically states it does not apply to administrative hearings before the Board of Claims. KRS 13B.020(3)(f)1.a. It further provides "[t]he provisions of this chapter shall supersede any other provisions of the Kentucky Revised Statutes and administrative regulations . . . to the extent these other provisions are duplicative or

---

[5] Kentucky Administrative Regulations.

-8-

in conflict." KRS 13B.020(1). Because 802 KAR 2:010 §13 appears to conflict with KRS 13B.020(3)(f)1.a., the statute controls. Having found KRS Chapter 13B inapplicable, we need not consider whether the Board erred in holding Dr. Lee's note admissible under KRE 703. The Board properly relied upon the permanent impairment rating assessed by Dr. Lee in finding Findley suffered a permanent injury.

WKU next argues that even if the Board did not err in relying upon Dr. Lee's hand-written note to establish permanent injury, the finding of permanent injury was not supported by substantial evidence. WKU argues the objective evidence shows Findley is not permanently injured. It points to photos taken six months after the injury that allegedly show Findley swimming and playing the piano. And his therapy records two months later said he had "made nice gains and improvements," and had met or partially met all therapy-related objectives. Finally, it references a social media post by Findley's father stating he could hold a fork and use a zipper.

All the evidence WKU cites, however, was disputed. Findley denied being able to play the piano with his injured hand or use it to pull himself out of the pool. Findley's parents both said he could not use a zipper and Findley testified he struggled pulling a night light out of a socket, tying his shoes, and had to use his left hand for assistance in cutting pancakes with a fork. WKU points to

evidence that Findley's injury has improved, but that does not foreclose a finding of permanent injury. Here, Dr. Lee assigned Findley a permanent impairment rating and Dr. West would not say that Findley lacked a permanent impairment. "A board's findings may not be overturned by a court when the findings of fact are supported by substantial evidence." *Redmon*, 599 S.W.2d at 476. Substantial evidence supported the Board's finding that Findley had a permanent injury, and the circuit court did not err in affirming the Board as to this issue.

Finally, WKU argues no substantial evidence supported the Board's finding that Findley's injury permanently diminished his earning capacity. It faults the Board for relying on the testimony Findley's vocational expert, Ms. Jones, rather than its own, Dr. Crystal. Specifically, it contends Ms. Jones' opinion that Findley's injury permanently reduced his earning capacity from $12.00 per hour to $8.00 per hour was contradicted by Findley securing a job paying $12.00 per hour at Cul2vate (a nonprofit that grows food for people in need) just fourteen months after the injury.

The Board found that Cul2vate made significant physical accommodations for Findley during his six-month internship and that given these accommodations, plus its charitable mission to train workers for the agriculture industry, Findley's pay rate while at Cul2vate "does not constitute a sufficient benchmark by which to judge his ability to earn money in the future." A better

indicator, according to the Board, was Findley's subsequent work as an intern at Optimara, a floral greenhouse. Ms. Jones testified that during Findley's time at Optimara, he "was not able to work as quickly as they had hoped . . . [or] would expect someone in that position to."

The Board relied heavily on Ms. Jones' expert opinions concerning Findley's loss of earning capacity. It noted that she performed "a highly technical analysis that balances the pre-existing condition of Findley's cognitive impairment[6] with the effect of his new injury to determine the differences between what his lifetime earnings would have been both before and after the accident." It discounted Dr. Crystal's assessment, finding his "wholesale rejection of a permanent impairment . . . not credible in light of [Findley's] treating physician and surgeon's assignment of such an impairment[.]"

The Board also relied upon the testimony of Findley and his parents that he "needs multiple breaks in a day to rehabilitate his hand when it locks up and his need for a variable work schedule so that if he works hard one day, he would need several easier days to recuperate." It further noted that both vocational experts agreed that "Findley is unlikely to find an employer who would be receptive to giving him so many breaks or such a variable schedule." The circuit court found that "although both parties presented compelling evidence, there is

---

[6] Findley was previously diagnosed with autism.

-11-

substantial evidence to support the Board['s]" finding that Findley suffered a permanent impairment to his earning power.

We agree with the circuit court that substantial evidence supports the Board's finding that Findley suffered a permanent impairment of his earning capacity because of the accident. "[T]he finding and award of the Board of Claims, if supported by substantial evidence, are conclusive." *Commonwealth, Dep't of Highways v. General & Excess Ins. Co.*, 355 S.W.2d 695, 699 (Ky. 1962) (citation omitted). This is true even if a reviewing court might reach a different result. *Seen Commonwealth Transp. Cabinet Dep't of Highways v. Shadrick*, 956 S.W.2d 898, 901 (Ky. 1997) (citation omitted). Therefore, we find no error.

Turning to Findley's appeal, he concedes the Board erred in failing to reduce his damage award but disputes the amount of the circuit court's reduction. KRS 49.130(2) states that "any damage claim awarded shall be reduced by the amount of payments received or the right to receive payment from workers' compensation insurance, Social Security programs, or other federal, state, or private programs designed to supplement income or pay claimant's expenses or damages incurred." The circuit court reduced Findley's $250,000 damage award by $191,486.65, finding this amount represented the amount of collateral source payments Findley had received or had the right to receive. The circuit court reasoned that $191,486.65 represents the true value of Findley's insurance

-12-

coverage because, without insurance, Findley would have been responsible for the full amount of his medical bills. Because he had insurance, Findley had the right to have his medical bills paid, which totaled $191,486.65.

Findley argues his reward should be reduced by $17,940.15, the amount actually paid by Medicare in satisfaction of his medical bills. Findley argues the intent of the statute is to prevent double recovery, citing Justice Stumbo's dissent in *Haney v. Commonwealth, Transportation Cabinet*, 958 S.W.2d 310, 311 (Ky. 1997). Because Medicare paid only $17,940.15, this is the amount that should be deducted from his damage award to prevent double recovery. He claims the circuit court disregarded the language of the statute when it reduced his award by the value of the benefit received rather than the amount insurance paid.

Statutory interpretation is a question of law and is reviewed *de novo*. *Friedmann v. Jefferson Cnty. Board of Education*, 647 S.W.3d 181, 188 (Ky. 2022) (citation omitted). "The fundamental rule in statutory interpretation is to give effect to the legislative intent." *Kentucky Indus. Utility Customers, Inc. v. Kentucky Utilities Co.*, 983 S.W.2d 493, 500 (Ky. 1998) (citation omitted). "To determine legislative intent, we look first to the language of the statute, giving the words their plain and ordinary meaning." *Richardson v. Louisville/Jefferson Cnty. Metro Gov't*, 260 S.W.3d 777, 779 (Ky. 2008). "We presume that the General

Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes." *Shawnee Telecom Resources, Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011).

We begin our analysis with a brief overview of the Board of Claims Act and Kentucky precedent interpreting KRS 49.130(2). The Board of Claims Act, KRS 49.040 *et. seq.*, constitutes a limited waiver of the Commonwealth's right of sovereign immunity. *Commonwealth Transp. Cabinet Dep't of Highways v. Abner*, 810 S.W.2d 504, 504 (Ky. 1991). As recognized by our Supreme Court in *Commonwealth, Transportation Cabinet, Bureau of Highways v. Roof*, 913 S.W.2d 322 (Ky. 1996), "the Commonwealth is under no obligation to make payment to injured parties because of the protections provided by the doctrine of sovereign immunity. KY. CONST. § 231. It is the province of the General Assembly to waive immunity, if at all, and only to the extent it sees fit." *Id.* at 325. "As a matter of grace, such a remedy may be granted, withdrawn or restricted at the will of the legislature. In its discretion it may fix or alter the amount recoverable." *University of Ky. v. Guynn*, 372 S.W.2d 414, 416 (Ky. 1963) (citations omitted).

In *Roof*, our Supreme Court considered whether KRS 49.130(2)[7] required the claimant's award to be reduced by the amount of basic reparation benefits she received from her private insurer. Because she suffered $314,602.90 in economic losses, Roof argued there was no possibility of unjust enrichment or double recovery, so a reduction from the Board's $100,000 award (the statutory cap at the time) was unnecessary. The Court disagreed, holding the "clear language of the statute . . . encompasses basic reparation benefits. As such, we can reach no conclusion other than that the General Assembly has seen fit to reduce damages awarded by the Board of Claims by sums received from private insurance." *Roof*, 913 S.W.2d at 325. Noting that while Roof's argument "appeal[ed] to [their] sense of equity," it nevertheless found "[t]he intent of the General Assembly is evident from the language of the statutes it enacted, and it is within its prerogative to impose such limitations and reductions as it sees fit. . . . We are bound by the chosen words of the General Assembly." *Id.* at 326.

Justice King, in a dissent joined by Justice Stumbo, argued: "[t]he clear intent of [KRS 49.130(2)] is to preclude an injured party from receiving a double recovery thereby being unjustly enriched. . . . Interpreting [KRS 49.130(2)]

---

[7] KRS 49.130 was previously KRS 44.070. In 2017, the General Assembly created KRS Chapter 49 and renumbered the Board of Claims Act. For consistency, we have updated all references to KRS 44.070 in this Opinion to KRS 49.130.

to require a reduction in an award when there is no double recovery, leads to an unjust and unduly harsh result." *Id.* (King, J., dissenting).

Almost two years later, the Court analyzed KRS 49.130(2) in the context of social security disability benefits in *Haney v. Commonwealth, Transportation Cabinet*, 958 S.W.2d 310 (Ky. 1997). The Board awarded Haney $16,100 for future medical bills following an injury caused by the Transportation Cabinet's negligence. By that time, Haney had received over $100,000 in Social Security benefits. Before the Supreme Court, Haney argued his Social Security disability benefits, which were designed to compensate for impairment of power to earn income, should not offset his damages for future medical bills. Citing *Roof*, the Court held "the clear language of the statute ('payments received or right to receive payment from . . . social security program') requires reduction from the maximum award available for Social Security disability payments." *Haney*, 958 S.W.2d at 311.

As in *Roof*, Justice Stumbo dissented, joined by Justices Graves and Wintersheimer, again arguing the intent of KRS 49.130(2) was to prevent double recoveries, and since there was no award by the Board for impairment of power to earn money, which Social Security benefits were designed to compensate, Haney's benefits should not offset his damages for future medical expenses, which had not been compensated for. According to the dissent, the statute should not be

interpreted "to require a reduction in an award when there is no double recovery[.]" *Haney*, 958 S.W.2d at 312 (Stumbo, J., dissenting).

Finally, in *Boarman v. Commonwealth*, 37 S.W.3d 759, 761 (Ky. 2001), Boarman filed a wrongful death action in the Board of Claims seeking $4,262.00 for funeral expenses and $1,000,000.00 for loss of future earnings. The Board dismissed her claim because the amount of collateral source payments she had received exceeded the maximum statutory award of $100,000.00. On appeal to the Supreme Court, Boarman argued her medical expenses should not be offset from her recovery because she did not bring a claim for personal injury against the Commonwealth and "the damages associated with personal injuries, i.e, the medical expenses, are not the 'damages incurred' in a wrongful death action." *Id.* at 762.

The Commonwealth responded that KRS 49.130(2) makes no distinction concerning whether a claim has or has not been made, requiring any damage award to be offset by "the amount of payments received or the *right to receive* payment[.]" KRS 49.130(2). The Court agreed, holding "the intent of the General Assembly was to offset any payments relating to the accident which are received by the [estate] . . . ." *Boarman*, 37 S.W.3d at 762. Because Boarman received medical expense payments intended to compensate the estate for damages, they should be offset from the Board's award. *Id.* The Court also held

-17-

Boarman's basic reparation benefits must be offset, declining to overrule *Roof*.
Justice Stumbo again dissented, arguing KRS 49.130(2) was designed to prevent double recovery.

Based upon the above, KRS 49.130(2) was designed to "offset any payments relating to the accident received by the claimant[.]" The statute is not intended to simply prevent double recovery, as argued by Findley. The relevant issue, however, is one of first impression in Kentucky: are medical expenses written off by a provider under an agreement with Medicare "payments received or the right to receive payment" under KRS 49.130(2)? The language of KRS 49.130(2), as well as the legislative intent evidenced in the Board of Claims Act as a whole, lead us to conclude yes.

The language of KRS 49.130(2) is unambiguous. The statute provides that any damage award by the Board shall be reduced "by the amount of payments received or the right to receive payment" from collateral sources "designed to . . . pay claimant's expenses or damages incurred."[8] The dictionary definitions of "payment" or "pay" include "to discharge indebtedness for" or "to discharge a debt or obligation." Thus, a payment can be more than the transfer of money. *Pay*,

---

[8] Findley does not dispute that Medicare benefits are "payments received . . . from . . . [a] federal . . . program[] designed to . . . pay claimant's expenses or damages incurred." KRS 49.130(2).

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/pay (last accessed May 1, 2024).

Medicare's payment of $17,940.15 in satisfaction of Findley's $191,486.65 in medical bills was a payment received because it discharged his debt or obligation to his providers. Findley's Medicare benefits were "designed . . . to pay [Findley's] expenses or damages incurred[,]" here, $191,486.65. It makes no difference that Medicare paid only $17,940.15 pursuant to its agreement with providers. The amount of the discharge, or payment received, was $191,486.65. As a Medicare beneficiary, Findley had the "right to receive payment" of his medical bills, here totaling $191,486.65. That was the payment he received.

This interpretation, which minimizes the Commonwealth's financial liability, is consistent with the Board of Claims Act's limitation on total damages recoverable and types of claims that may give rise to liability. *See* KRS 49.040(1) (limiting a single damage claim award to $250,000); KRS 49.020(5) (disallowing claims for damages for mental distress or pain and suffering). As recognized by our Supreme Court, "the Commonwealth is under no obligation to make payment to injured parties because of the protections provided by the doctrine of sovereign immunity." *Roof*, 913 S.W.2d at 325 (citation omitted). "As a matter of grace, such a remedy may be granted, withdrawn or restricted at the will of the

-19-

legislature." *Guynn*, 372 S.W.2d at 416 (citations omitted). "[I]t is within its prerogative to impose such limitations and reductions as it sees fit." *Roof*, 913 S.W.2d at 326 (citations omitted). Here, the General Assembly has seen fit to reduce the amounts recoverable by "payments received or the right to receive payment," which, according to the clear language of KRS 49.130(2), encompasses debts or obligations discharged. Therefore, the circuit court did not err in reducing Findley's award by $191,486.65, the amount of his medical bills that were discharged.

Wherefore, the opinion of the Warren Circuit Court is affirmed.

ALL CONCUR.

BRIEF FOR APPELLANT/CROSS-APPELLEE:

Henry S. Queener
Somerset, Kentucky

BRIEF FOR APPELLEE/CROSS-APPELLANT:

Alex Thomason
Thomas N. Kerrick
Bowling Green, Kentucky